## Chicago & Alton Railway Company v. Olive M. Reynolds, Administratrix.

1. REVERSAL WITHOUT REMANDMENT—*when ordered.* The Appellate Court has power to and will reverse without remanding where it finds that the evidence did not and could not support a verdict in favor of the appellee.

Action in case for death caused by alleged wrongful act. Appeal from the Circuit Court of Sangamon county; the Hon. ROBERT B. SHIRLEY, Judge, presiding. Heard in this court at the May term, 1906. Reversed, with finding of fact. Opinion filed November 27, 1906.

PATTON & PATTON, for appellant; F. S. WINSTON, of counsel.

ROBERT H. PATTON, for appellee.

MR. JUSTICE PUTERBAUGH delivered the opinion of the court.

This is an action in case by appellee, as the administratrix of the estate of Frank A. Reynolds, deceased, against appellant, for the recovery of damages accruing by reason of the death of her intestate, which it is alleged was caused by the negligence of appellant. The trial resulted in a judgment in favor of plaintiff for $5,000, to reverse which the defendant appeals.

The material facts involved so far as we deem it necessary to recite them are as follows: Appellant owns and operates a railroad having a track running through the village of Thayer, Illinois, in which village the C., W. & V. Coal Co. operates a coal mine. About one-half mile north of such mine is a plant used by the Illinois Washer Co. for washing the refuse and impurities from coal. The two industries are connected by a private side track which runs parallel with the tracks of appellant, and is owned by the coal company. Under the arrangements existing between the two companies and appellant at the time of the accident to the deceased, coal was loaded at the coal mine into cars and then by appellant's engines carried down the side track to the washer plant where the cars were unloaded by the employes of the washer company by means of conveyors. After the coal was washed it was reloaded into the cars from which it had been taken, and redelivered to the coal company. In delivering the coal from the mine to the washer plant, the cars containing the same were hauled from the mine over the side track by a switch engine and crew of appellant, until a cross-over connecting the side track with appellant's track was reached, when the engine made a flying switch, letting the cars run on down

the side track, after which the engine pushed them down and stopped them at such point on the track near the washer plant as the servants of the washer company by signal indicated. The operation of so setting the cars at the washer plant was under the direction and control of the employes of the washer company, but the switching charges of appellant were paid by the coal company. After the cars were set near the washer plant the employes of the washer company by means of pinch bars or a rope would move two of them down at a time and stop them under the washer shed with blocks of wood called "sprags" set under the wheels. They were then unloaded into the washing apparatus by machines which were raised and lowered by the men in charge, and which scooped the coal from the cars and elevated it into the apparatus. When such cars were unloaded they were pinched along the track about a car length and again stopped with "sprags" and reloaded with washed coal. On the evening prior to the accident appellant's switch crew set a cut of cars on the washer end of the side track about 100 yards south of the washer plant and left them coupled together with the brakes set. On the morning of the day of the accident, four of these cars, one of which had a defective brake, had been run in under the washer shed and stopped there by "sprags." At about nine o'clock the south two cars had been unloaded and the north nearly so, whereupon one Ball, an employe of the washer company started to go to the cut of cars which had been set the night before, to pinch them down, but he saw the switch engine coming with more cars and concluded to allow the engine to push the set cars down nearer the washer shed. When they had been so pushed to near the point where he desired them, he started to set the brake on the north car but found that it failed to work. He then gave a stop signal and the engine stopped, holding with

it a number of cars. Four of them, however, had apparently been uncoupled from the others and failed to stop, but ran on down and collided with the cars standing under the shed, causing all six cars to run down the grade and under the shed. In the meantime the conveyors had been lowered and the deceased had gone under the north car of those under the shed and was engaged in repairing the brake thereon. When the collision occurred he was run over and killed.

It is insisted by appellant, that the court erred in refusing to give the peremptory instructions offered at the close of the evidence, for the reason, among others, that the deceased was guilty of such contributory negligence as to preclude a recovery.

The witness Ball, who was called in behalf of appellee, testified on cross-examination, that he had worked at the washer plant for about four months prior to the accident; that from a point 100 to 150 yards south down to the washer shed there was a down grade; that from that point when started a car would run down and under the shed of its own weight; that while cars were generally stopped at the shed by the brakes or by "sprags," if the car got a good start "sprags" would not stop them; that he had seen cars on many occasions, perhaps once a week, get started down the grade and run almost through the shed; that it was a matter of common occurrence; that when one of the men went up to the top of the grade to pinch a car down, all of the others got out of the way, knowing that if he lost control of the car it might run down through the shed and run over any one who happened to be in the way; that the switch crew were in the habit of setting cars upon the side track at any time of day from nine in the morning until three o'clock in the afternoon.

The witness Ramsey, also called by appellee, testified upon cross-examination, that he was employed at the washer plant at the time of the accident; that in pinching down cars that had no brakes, the men

were frequently unable to stop them with "sprags" and the cars would "bump" into those in the shed. Baumgartner, another witness in behalf of appellee, testified on his cross-examination, that he also was at the time employed in running one of the conveyors under the shed; that when the cars were brought down the conveyors were always raised out of the way to prevent their being damaged in the event that the cars should run through the shed, and that was part of his duties; that several times cars without brakes had run down beyond where they were wanted; that several times when he and deceased were working there, cars which had been pinched down had gotten out of control, and had "bumped" cars under the shed; that this was a thing that they were all watching for; that all the men around the shed were looking for it to happen and when they knew that one of the men had gone down to pinch or start a car they looked out for themselves to keep from getting hurt in case the car should run too far. Witness William Bailey, called by appellee, testified substantially the same as the last witness. Woodward, the foreman of the washer plant, testified on behalf of appellant that on the day of the accident a car had run off the track because of a defective brake, and that shortly before the accident he told deceased not to bother fixing or trying to fix any more brakes; that they were not running a repair shop for appellant. He further testified that sometime before the accident one of the employes while repairing a brake had narrowly escaped injury; that witness then told the washer crew a number of times to be careful and take no chances when repairing brakes and to have some one watching out for them when they did so.

From the foregoing and other evidence, it appears that the deceased had been employed about the washer plant for at least eighteen months, and that his duties consisted in reloading the coal into the

cars after it had been washed, and then riding on the loaded cars up to the north end of the switch track where the washed coal was redelivered to the coal company; that he must have known that cars often ran down the grade of the track and "bumped" into the cars under the shed. It further appears that the employes of the washer company were not required to repair defective brakes, but on the contrary deceased had been especially told that he need not do so; that he did not inform any one of his intention to fix the brake, nor did he request any one to give him warning in case of danger; that he undertook the job without orders and voluntarily, knowing that a car was about to be pinched down to the shed. It still further appears that at the time he went under the car, the conveyor was running immediately above the car, rendering it difficult for him to hear any warning that might have been given him.

In view of the foregoing facts and circumstances, which are practically uncontroverted, we are of opinion that the contention of appellant was well founded, and that at the time and immediately preceding his death, the deceased was not exercising ordinary care for his own safety.

Under the power conferred by section 87 of the Practice Act, we are constrained to reverse the present judgment without remanding the cause, for the reason that the weight of the evidence did not authorize the verdict. Supple v. Agnew, 202 Ill. 351; Trakal v. Heusner Baking Co., 204 Ill. 179; C., C., C. & St. L. Ry. Co. v. Alfred, 123 Ill. App. 477.

*Reversed without remanding.*

Finding of fact, to be incorporated in judgment of this court:

We find from the evidence that the deceased, Frank A. Reynolds, was not, at the time he was injured, in the exercise of due care and caution for his own safety.